

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF OHIO

EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | INFORMATION |
| | ) | **4 : 15 CR 383** |
| Plaintiff, | ) | |
| v. | ) | CASE NO. |
| | ) | Title 18, Section 1344, |
| RAYMOND JAMES RICH, JR., | ) | United States Code |
| | ) | **JUDGE PEARSON** |
| Defendant. | ) | |
| | ) | JUDGE |

The United States Attorney charges:

## COUNT 1 – BANK FRAUD
### (18 U.S.C. § 1344)

At all times material herein:

1.     Defendant RAYMOND JAMES RICH, JR. ("RICH") was a resident of Youngstown, Ohio, and the owner and operator of Jim Rich Realty and Management Company, LLC. ("Rich Realty"), located in Youngstown, Ohio.

2.     RICH was a real estate agent licensed by the State of Ohio.   As a licensed real estate agent, lenders relied on RICH to prepare purchase agreements and related real estate documents that were truthful and accurate.

3.     A.L., an individual known to the Grand Jury but not charged herein, was an individual living in Youngstown, and purchased the property located at 129 Forest Hill Road, Youngstown, Ohio ("Forest Hill"), with the assistance of RICH and Rich Realty.

4.     G.S., an individual known to the Grand Jury but not charged herein, was a builder by trade, and the seller of the Forest Hill property after having purchased and rehabbed it.

5.     The Federal Housing Administration ("FHA") provided mortgage insurance on loans made by FHA-approved lenders, and insured mortgages on single and multifamily homes.

6.     Michigan Mutual, Inc. ("Michigan Mutual") was a financial institution, as defined pursuant to 18 U.S.C. §§ 20 and 27, in that it was a mortgage lending business that financed a debt secured by an interest in real estate and whose activities affected interstate commerce. Michigan Mutual was located in Southfield, Michigan, and was a FHA approved lender.

7.     On or about May 27, 2011, RICH and G.S. discussed the possibility of G.S. selling the Forest Hill property. RICH asked G.S. how much money he would want to make from the sale of the property. G.S. advised RICH he wanted to clear $100,000. RICH completed a Jim Rich Reality Net Listing Agreement that stated if RICH sold the Forest Hill property for an amount over $100,000 he could keep any proceeds over the $100,000 as his commission. Both RICH and G.S. signed the Net Listing Agreement.

8.     In or around November 2011, after not being able to qualify for a conventional loan, A.L. approached RICH about whether RICH could assist her in locating and purchasing a home valued at approximately $50,000.

9.     On or about November 7, 2011, A.L. signed a Jim Rich Realty Real Estate Purchase Contract offering to purchase the Forest Hill property for $138,000. RICH added G.S.' signature to the Purchase Contract.

2

10.     RICH selected the purchase price of $138,000.

11.     On or about January 12, 2012, after A.L. did not qualify for the initial loan to purchase the Forest Hill Property, A.L. signed a second Jim Rich Realty Real Estate Purchase Contract offering to purchase the Forest Hill property for $138,000. RICH again added G.S.' signature to the Purchase Contract.

12.     A.L. advised RICH that she did not have the necessary funds for the down payment to purchase the Forest Hill property. RICH advised he would give A.L. the money for her down payment.

13.     On or about February 2, 2012, RICH provided A.L.'s mother, D.L., with approximately $5,500 in cash. D.L. deposited the $5,500 into her Huntington Bank account ending in 2669. Then, D.L. purchased a Huntington Bank cashier's check number 1252220108 in the amount of $5,500 paid to the order of A.L., which A.L. deposited into her PNC Bank account ending in 8411.

14.     On or about February 2, 2012, D.L. and A.L. signed a gift letter prepared by RICH stating that D.L. made a gift of $5,500 to A.L., her daughter, to be used by A.L. for the down payment on the purchase of the Forest Hill property.

15.     On or about February 21, 2012, A.L. signed the mortgage loan application and allowed it to be submitted containing false information regarding the source of her down payment funds. The loan application asserted that A.L. provided the down payment from her own personal funds when in fact RICH had provided the down payment.

16.     On or about February 21, 2012, RICH completed a worksheet for the Forest Hill property listing the "sale amount" at $138,000; the "net listing amount" at $100,000; the amount of the seller's closing costs; the "total due to seller" at $96,697.57; and, included a paragraph stating that

a check would be made payable to the seller at closing in the amount of $129,884.58. Of this amount, Rich Realty could retain $33,187.01, and RICH would write a check to seller in the amount of $96,697.57. RICH had G.S. sign the worksheet acknowledging the structure of the real estate transaction, on or about February 21, 2012.

17. On or about February 21, 2012, A.L. obtained PNC cashier's check number 0717353 made payable to Valley Title and Escrow Agency ("Valley Title") in the amount of $4,830 - the exact amount needed for the down payment on the Forest Hill property - and listed herself as the remitter.

18. On or about February 21, 2012, A.L. signed the settlement statement, or HUD-1, falsely attesting that all of the information on the HUD-1 was true and accurate, including the assertion that she provided the necessary down payment money from her own personal funds, when in fact both A.L. and RICH knew that RICH provided the down payment funds.

19. On or about February 22, 2012, Valley Title prepared the distribution of the loan proceeds as detailed on the HUD-1, including a check in the amount of $3,000 to Jim Rich Realty for RICH's commission, and a check in the amount of $129,884.58 to G.S., as the seller's proceeds from the sale. On or about February 23, 2012, Michigan Mutual approved A.L's loan application and funded the loan by wiring approximately $137,967.85 to Valley Title.

20. On or about February 22, 2012, RICH forged G.S.'s signature on the back of the Valley Title check in the amount of $129,884.58, and deposited it into his Rich Realty PNC Bank account ending in 4126.

21. On or about February 24, 2012, RICH drafted check number 15097 on his Rich Realty PNC Bank account in the amount of $96,697.57, made payable to PNC, in order to purchase PNC Bank cashier check number 071739 in the same amount, made payable to G.S.

4

22.     A.L. was not able to make her mortgage payments, defaulted on her mortgage loan, and the Forest Hill property went into foreclosure.   Since the FHA insured A.L.'s loan on the Forest Hill property, when the property went into foreclosure, FHA suffered a loss and paid a claim of $134,139.27 on the loan to make the lender whole.

23.     From in or around November, 2011, through on or about February 24, 2012, in the Northern District of Ohio, Eastern Division, and elsewhere, Defendant RAYMOND JAMES RICH, JR., along with others known and unknown to the Grand Jury, knowingly executed and attempted to execute a scheme and artifice to defraud Michigan Mutual, Inc., a financial institution, and to obtain moneys, funds, credits, assets, securities, and other property owned by and under the custody and control of Michigan Mutual, Inc., by means of false and fraudulent pretenses, representations, and promises, in connection with a mortgage loan in the amount of approximately $137,967.85 in the name of A.L. on property located at 129 Forest Hill Road, Youngstown, Ohio 44512.

All in violation of Title 18, United States Code, Sections 1344.


STEVEN M. DETTELBACH
United States Attorney

By:  _Ann C. Rowland_

ANN C. ROWLAND
Chief, Major Fraud and Corruption Unit